IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Maritza Dominguez Braswell**

Civil Action No. 1:20–cv–00495–MDB

JOSEPH A. VIERA, an individual, and
LYNN DEMCHAK-VIERA, an individual

 Plaintiffs,

v.

AMICA MUTUAL INSURANCE COMPANY, a corporation incorporated in the state of Rhode Island,

 Defendant.

## ORDER

 This matter is before the Court on Plaintiffs' Motion to Set Aside Appraisal Award as to Total Amount of Loss and to Reopen Discovery. (["Motion"], Doc. No. 74.) Defendant has responded in opposition, and Plaintiffs have replied. (["Response"], Doc. No. 77; ["Reply"], Doc. No. 78.) The Court also held a hearing on February 7, 2023. Having reviewed the parties' briefs and supporting documentation, and having heard the parties during oral argument, the Court **GRANTS in part and DENIES in part** the pending Motion.

## STATEMENT OF THE CASE

 The following facts are derived from the Complaint and the parties' briefing. Defendant Amica Mutual Insurance Company ["Amica" or "Defendant"] issued an insurance policy covering the residential property located at 16389 Forest Light Drive in Colorado Springs,

Colorado 80908. ["Property"] (Doc. No. 52-2.) Plaintiffs allege that on or about July 20, 2019, a hailstorm—which Plaintiffs allege brought "golf-ball to baseball sized hail," struck the Property. (Doc. 6 at ¶¶ 12, 31.) "Plaintiffs suspected, based upon the nature of the storm, that there may be damage to their property, specifically their roof and sought an inspection of the same." (*Id*. at ¶ 13.) Plaintiffs also allege that they "observed water intrusion into their home in the way of wet flooring and carpets, as well as water damaged paint on their walls." (*Id*. at ¶ 16.)

In response to Plaintiffs' notice, Defendant dispatched Jim Martin—an insurance adjuster employed by Acorn Claims—to inspect the Property. (*Id*. at ¶20.) Mr. Martin prepared what Plaintiffs call "Estimate 1," totaling $53,412.75 for the Property and $640.78 for the detached greenhouse. (*Id*. at ¶ 21.) Defendant eventually sent another insurance adjuster, Tim Tomlinson—also from Acorn Claims—to conduct another inspection and prepare what Plaintiffs call "Estimate 2," which totaled $70,600.69 for the Property and $5,078.03 for the detached greenhouse. (*Id*. at ¶¶ 23-24.)

Plaintiffs allege they observed additional damage, beyond what was observed and reported in Estimate 2, but Defendant responded that their independent adjuster could not find any damage to the stucco, manufactured stone, fascia, or any loss-related damage to the interior carpeting, wood floor, cabinet, wood beams. (*Id*. at ¶¶ 25-27.) According to Plaintiffs, Defendant's response included citations to coverage exclusions. (*Id*. at ¶ 28.) Plaintiffs eventually "observed mildew smells within their ground floor rooms…and suspected mold growth within the walls which were damaged from the water intrusion." (*Id*. at ¶ 35.) On or about January 3, 2020, Plaintiffs hired Ampro Inspections, Inc. to inspect for mold, and they "identified at least three (3) types of harmful fungi intrusion and growth." (*Id*. at ¶¶ 37-38.)

Plaintiffs allege Mr. Viera has respiratory issues that require daily oxygen use, so they decided to engage in remediation efforts. (*Id*. at ¶¶ 39-43.) Less than a month later, Plaintiffs filed this lawsuit. (*See* Doc. No. 1-2.)

Defendant filed an Answer shortly after the case was removed to federal district court. (Doc. No. 10.) The original scheduling order set the discovery deadline for November 25, 2020, and the dispositive motion deadline for December 25, 2020. (Doc. No. 24.) However, after some extensions, discovery closed on February 26, 2021. (Doc. No. 31.) The matter was set for a jury trial on August 9, 2021, with a readiness conference set for July 15, 2021. (Doc. No. 39.) Thereafter, the parties were active in filing proposed jury instructions, exhibit lists, witness lists, and proposed voir dire. (Doc. Nos. 39, 42-51.) In other words, the docket reflects a case that was gearing up for trial. However, just before the readiness conference, Defendant invoked the appraisal clause and filed a motion to dismiss or stay the litigation and compel an appraisal. (Doc. No. 52.) The appraisal provision provides as follows:

> **F. Appraisal**
>
> If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the **residence premises** is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.
>
> Each party will:
>
> 1. Pay its own appraiser; and
> 2. Bear the other expenses of the appraisal and umpire equally.

(Doc. No. 52-2 at 27.) Upon receiving Defendant's motion to compel appraisal, the court rescheduled the readiness conference to July 20, 2021, at which time the court denied Defendants' motion to compel appraisal, finding that by "waiting until less than a month before trial to invoke the appraisal provision, Defendant has waived the right to insist on the appraisal option in the insurance contract and clearly has elected to go forward with trial instead." (Doc. No. 55.) The final pretrial order was entered, and the matter was near ready for trial. (Doc. No. 56.)

However, two days later, on July 22, 2021, the parties appeared for a status conference, during which Plaintiffs represented that they reconsidered their position and decided to move forward with an appraisal. (Doc. No. 59.) Defendant agreed. The jury trial was vacated, the case was stayed, and the parties commenced with the appraisal process set forth in the policy. (*Id.*) On September 20, 2021, the parties filed a Joint Status Update in which they represented that "the Appraisal process began more slowly than expected but is now moving appropriately and [the parties] would request that this Court grant another extension to resolve these matters for an additional sixty (60) to ninety (90) days to allow the Appraisers to finish their review, inspections, interviews, and reports." (Doc. No. 60 at 2.) The update further stated that "Plaintiffs have elected to use David Hann of American Claims LLC as their Appraiser." (*Id.* at 1.) It also stated that "Defendant has elected to use Aaron Sullenberger as their Appraiser." (*Id.*) At that point in time, the Appraisers had not yet selected an umpire. (*Id.*)

Approximately three months after the Joint Status Update was filed, Plaintiffs filed a motion asking the court to halt the appraisal process due to a lack of good faith participation by Defendant. (Doc. No. 61.) Specifically, Plaintiffs argued that Appraiser Sullenberger was not

4

engaging in good faith because he was "ignoring the claimed damages in an effort to limit the amount of loss," and had stated in an email accompanying his report "that he would not be evaluating any of the interior damages because that was related to a separate date or incident of loss." (*Id.* at 7-8.) Plaintiffs also raised Appraiser Sullenberger's potential bias stating that "Plaintiffs notified Defendant's counsel that they objected to the selection of Mr. Sullenberger as not being impartial because of his prior work with ACORN claims, an adjustment agency that was directly involved with the underlying litigation." (*Id.* at 3.) Plaintiffs further argued that they "participated [in the appraisal] reluctantly in hopes of avoid [sic] a trial. But with the Defendant not participating in good faith in the process and selected [sic] a biased appraiser who then takes an advocacy role for the Defendant, the Plaintiff no longer has any interest in entertaining further delays and games form the Defendant." (*Id.* at 8.) Plaintiffs requested that trial be reset, discovery be reopened, and sanctions be imposed on Defendant for their bad faith. (*Id.* at 8-12.) The motion was fully briefed in January 2022. In the interim, Magistrate Judge Tafoya retired, and the matter was reassigned to Magistrate Judge Reid Neureiter, who ordered a motion hearing. (Doc. No. 67.) On February 28, 2022, Judge Neureiter denied Plaintiffs' motion to halt the appraisal process, but without prejudice. (Doc. No. 70.) He ordered that the appraisal process continue to its conclusion, at which time the parties could contact the court for a status conference. (*Id.*) The matter was again reassigned, this time to the undersigned. Seeing no activity on the docket after Judge Neureiter's order, the Court ordered a status conference, during which Plaintiffs indicated their intent to refile the prior motion now that the appraisal was indeed complete. The Court set a briefing schedule for the instant Motion. (Doc. No. 73.)

## ANALYSIS

In their Motion, Plaintiffs ask this Court to: (1) set aside the appraisal award; (2) reopen discovery, which Plaintiffs believe will reveal bad faith on the part of Defendant during the appraisal process; and (3) impose sanctions on Defendant for its bad faith in invoking the appraisal provision at this late stage and for participating in the process in bad faith. The Court will address each request in turn.

### I.     Request to Set Aside the Appraisal Award

Plaintiffs launch three attacks on the appraisal award. Although the challenges are weaved in and out of different arguments throughout their Motion and Reply, they can be summarized as follows: first, the appraisal award is improper because it incorporates impermissible coverage determinations rather than setting out the total cash value of the claimed loss. (Doc. No. 74 at 8-10.) Second, the appraisal award should be set aside because it does not comply with the contractual requirement that it be accepted by the umpire and at least one "impartial and competent" appraiser. (*Id.* at 10-12.) This second challenge is, at bottom, an attack on Appraisal Sullenberger's impartiality and competence. Third, that the Umpire, Ms. Laura Haber, was also biased and/or not competent.[1] (*Id.* at 12-14.)

---

[1] It is unclear whether Plaintiffs make this argument in their Motion, but on Reply and during oral argument, Plaintiffs clearly challenged Ms. Haber's impartiality and competency. (*See* Doc. No. 78 at 5 ("[A]s to the Umpire, Ms. Haber, the Plaintiffs submit that the information now available indicates sizeable concerns related to Ms. Haber's impartiality (based upon her history of criminal activity and prior involvement in other cases) and her competency (specifically in not following the standard law of appraisals as articulated in *Summit Park* and in awarding damages for mold coverage but not for water intrusion).").)

Under Colorado law, which governs here,[2] an appraisal award issued under an insurance policy "is binding so long as the appraisers (including the umpire) have performed the duties required of them by the policy." *Andres Trucking Co. v. United Fire & Cas. Co.*, 488 P.3d 425, 433-34 (Colo. App. 2018). "As a general matter, an appraisal award entered by an umpire may be disregarded only if the award was made without authority or was made as a result of fraud, accident, or mistake." *Id.* at 434. Plaintiffs, as the party challenging the appraisal award here, bear the burden of demonstrating that the appraised amount should be set aside. *Id.* at 434.

A.   **Coverage vs Causation Determinations**

The Court first considers whether the award improperly incorporates coverage determinations. The crux of Plaintiffs' argument is that "the refusal of the appraisal panel to appraise all of the damages complained of (i.e., interior water damage) operates as a coverage determination usurping the proper role of the Court." (Doc. No. 78 at 2.)

In analyzing what the appraisers and umpire should or should not have done, the Court begins by construing the insurance policy at issue. *Cary v. United of Omaha Life Ins. Co.*, 108 P.3d 288, 290 (Colo. 2005) (noting that an insurance policy must be enforced "as written unless the policy language contains an ambiguity."); *Mid-Century Ins. Co. v. Robles*, 271 P.3d 592, 594 (Colo. App. 2011); *Compton v. State Farm Mut. Auto. Ins. Co.*, 870 P.2d 545, 547 (Colo. App. 1993) ("[W]ords should be given their plain meaning according to common usage, and strained constructions should be avoided."). Here, the policy requires that each appraiser "separately set the amount of loss[,]" and if the appraisers do not agree on the amount, they will submit their

---

[2] The court's jurisdiction in this matter is based on diversity of citizenship. Therefore, Colorado substantive law applies. *Essex Ins. Co. v. Vincent*, 52 F.3d 894, 896 (10th Cir. 1995).

7

differences to the mutually agreed upon umpire. (Doc. No. 52-2 at 27.) Any decision agreed on by the umpire and one other appraiser "will set the amount of loss." (*Id.*) And, while the policy does not define the phrase, the plain meaning of "amount of loss" necessarily includes a determination as to the cause of that loss. *See BonBeck Parker, LLC v. Travelers Indem. Co. of Am.*, 14 F.4th 1169, 1181 (10th Cir. 2021) ("[B]ecause we conclude that the Colorado Supreme Court, if faced with the issue, would recognize that the ordinary meaning of the phrase 'amount of loss' encompasses causation issues, the district court properly interpreted the Policy to conclude that the [appraisal panel] could determine the cause of [the insured's] roof damage."); *see also Phila. Indem. Ins. Co. v. WE Pebble Point*, 44 F. Supp. 3d 813, 817-18 (S.D. Ind. 2014) (observing that "it would be extraordinarily difficult, if not impossible, for an appraiser to determine the amount of storm damage without addressing the demarcation between 'storm damage' and 'non-storm damage'"). Indeed, Plaintiffs do not dispute that. (*Id.* at 1 (stating that Plaintiffs do not disagree with the holding in *BonBeck*, that "the appraiser panel [may] make causation determinations[.]").)

Still, Plaintiffs argue that the appraisers and umpire did not make causation determinations, but rather legal determinations, including on issues of coverage. (Doc. Nos. 74; 78 (relying heavily on *Auto-Owners Ins. Co. v. Summit Park Townhome Assoc. ("Summit Park Townhome I")*, 100 F. Supp. 3d 1099 (D. Colo. 2015)); *see also Auto-Owners Inc. Co. v. Summit Park Townhome Ass'n ("Summit Park Townhome II")*, 129 F. Supp. 3d 1150, 1154 (D. Colo. 2015)*.* Thus, the Court is called upon to determine whether the appraisal award is based on appropriate *causation* determinations, or whether the Defendant's appraiser and the umpire made improper *coverage* determinations beyond the scope.

"Typically, an issue is 'beyond the scope' if it involves a legal construction of the insurance policy itself (rather than a factual determination), such as whether a particular building is 'covered' under the policy." *Concept Rests., Inc. v. Travelers Indem. Co.*, No. 16-cv-00450-DME-NYW, 2016 WL 8737773, at *3 (D. Colo. Dec. 2, 2016); *Summit Park Townhome II*, 129 F. Supp. 3d at 1154 (observing that, "while appraisal could 'give figures for the value of the property,' it would resolve only 'a part of the overall dispute' between the parties; it would not resolve other issues, like whether the policy provided coverage for complete replacement of a particular roof'"). An issue also falls outside the scope of the appraisal where the parties agree beforehand to limit or restrict that issue from the appraisal's scope. *Concept Restaurants*, 2016 WL 8737773, at *3 (citing *Laredo Landing Owners Ass'n v. Sequoia Ins. Co.*, No. 14-cv-01454-RM-KMT, 2015 WL 3619205, at *2 (D. Colo. June 10, 2015)).

Here, Plaintiffs have not offered any documentation or support that persuades the Court that the determinations made by Appraiser Sullenberger or Umpire Haber were beyond the scope, or that the appraisal award incorporates coverage determinations. The purpose of the appraisal was to set the amount of loss. (*See* Doc. No. 77-2 (correspondence between counsel serving as a formal demand for appraisal and indicating the appraisal is to be conducted in accordance with the policy to "resolve the dispute over the amount of loss").) Contrary to Plaintiffs' assertions, Appraiser Sullenberger does not appear to have arbitrarily excluded damages to the interior of the home. Instead, he indicated in the cover email transmitting the estimate, that he did not include any value for the interior because he believed that damage was "due to ice damming, poor roofing drainage, poor stucco drainage and poor soil drainage at the front of the home where the wine room resides below." (Doc. No. 74-6 at 1.) Appraiser

Sullenberger goes on to explain his causation conclusions, and notes that "[t]he microbial growth found in the attic is typical of ice damming, not hail during dry and hot time of year." (*Id.*) Similarly, Umpire Haber explains that she reviewed all documentation submitted by both sides, multiple times, and she simply "could not correlate the excess water damages to the hail storm." (Doc. No. 74-10 at 1.)

In other words, both the Defendant's appraiser and the umpire made determinations about what damage correlated to or was caused by the hailstorm, and what damage was not correlated to or caused by the hailstorm. This was a determination the appraisal panel was permitted to make. *See BonBeck Parker*, 14 F.4th at 1178, 1182 (noting that "as here, 'the causation question involves separating loss due to a covered event from a property's pre-existing condition'"); *Garcia v. State Farm Mut. Fire & Cas. Co.*, No. 20-CV-02480-PAB-MEH, 2021 WL 4439792, at *3 (D. Colo. Sept. 27, 2021) ("[W]hen an insurance provider made a determination that a hailstorm did not cause the damage the insured asserted was covered, the causation analysis was of the type that is contemplated by the appraisal process.") (internal quotations marks and alterations omitted); *State Farm Lloyds v. Johnson*, 290 S.W.3d 886, 893 (Tex. 2009) ("An appraisal is for damages caused by a specific occurrence, not every repair a home might need. . . . Any appraisal necessarily includes some causation element, because setting the 'amount of loss' requires appraisers to decide between damages for which coverage is claimed from damages caused by everything else."); *see also Wausau Ins. Co. v. Herbert Halperin Dist. Corp.*, 664 F. Supp. 987, 988-89 (D. Md. 1987) (presenting a hypothetical of a dispute subject to an appraisal provision in which the insured "was disputing that as a factual matter a larger area than that immediately damaged by the occurrence had to be repaired in order to repair the immediate

damage itself[;] this would constitute an 'amount of loss' question"); *Travelers Indem. Co. v. BonBeck Parker, LLC*, 223 F. Supp. 3d 1155, 1160 (D. Colo. 2016) ("[T]he question of what must be replaced in order to adequately repair the damage caused by the admittedly covered Event in this case . . . is a question of the extent or 'amount of loss,' and is therefore, appropriate for appraisal."); *Griffin v. State Farm Lloyds*, No. SA-20-CV-1198-OLG-HJB, 2021 WL 7184962, at *3 (W.D. Tex. Nov. 22, 2021) ("Ultimately, the issue of whether hail damage caused a certain amount of damage to Plaintiff's property, and whether the roof should be repaired or replaced, was proper for the appraisal to decide.").

Therefore, this is unlike cases where there is a clear issue of coverage for the Court to determine outside of causation determinations. *See Summit Park Townhome I*, 100 F. Supp. 3d at 1104 (holding that a dispute as to whether the policy required the insurer to pay to replace property that was not damaged in the hailstorm in order to achieve visual consistency was "a clear example of a coverage issue beyond the scope of appraisal"); *Fireman's Fund Ins. Co. v. Steele St. Ltd. II*, No. 19-1096, 2022 WL 39392, at *6 (10th Cir. Jan. 5, 2022) (rejecting the insurer's argument that the appraisal process necessarily implicated "legal questions of coverage," and stating that the appraisal's purpose was to resolve "overall, factual-causation issues" as to "whether the hailstorm's effects extend beyond or are distinct from the [wear and tear] that ordinarily would be intended or expected from the type of brick found on the Building and, relatedly, . . . the costs of remedying those effects"). The appraisal process yielded causation determinations that were entirely appropriate, so long as the members of the appraisal panel were impartial and competent.

**B.      Impartiality and Incompetence**

It follows then, that the Court must consider whether the appraisal award should be set aside due to bias or incompetence.

As a threshold matter, the Court notes that unlike other policies, this policy's appraisal provision does not expressly state that the umpire's decision is binding. (Doc. No. 52-2 at 27.) However, it does state that the umpire's decision, so long as it is also signed by one other competent and impartial appraiser, will "set" the "amount of loss." (*Id.*) Moreover, "Colorado possesses a tradition of supporting alternative dispute resolution mechanisms when agreed to by the parties." *City & Cnty. of Denver v. Dist. Ct.*, 939 P.2d 1353, 1361 (Colo. 1997). "Although an appraisal process is not on all fours with arbitration, both are 'rooted in similar policies of economy for the parties and judicial efficiency.'" *Laredo Landing Owners*, 2015 WL 3619205, at *2 (quoting *City & Cnty. of Denver*, 939 P.2d at 1363)); *see Summit Park Townhome I*, 100 F. Supp. 3d at 1103 ("A purpose of appraisal provisions is to avoid litigation and encourage settlement."). Therefore, similar to an arbitration agreement, the court "must accord the parties a presumption in favor of appraisal and must resolve all doubts about the scope of the appraisal clause in favor of the appraisal mechanism." *Laredo Landing Owners*, 2015 WL 3619205, at *2 (quoting *City & Cnty. of Denver*, 939 P.2d at 1364); *see also Summit Park Townhome II*, 129 F. Supp. 3d at 1154 (finding that an appraisal award results in a "binding factual determination" as to the amount of loss); *Concept Restaurants*, 2016 WL 8737773, at *3 (observing that courts in this District have "reaffirmed that interpretation of Colorado law on multiple occasions"); *see also Wagner v. Phoenix Ins. Co.*, 348 P.2d 150, 152 (Colo. 1960) ("In the instant case plaintiffs made demand for the appointment of appraisers to determine the amount of the loss, and by so

doing irrevocably exercised their option to determine that question as provided by the appraisal clause of the policy.").

That said, the plain language of the appraisal provision requires that the appraisers selected by each party be "competent and impartial." (Doc. No. 52-2 at 7.) It further provides that when the appraisers do not agree, the amount of loss will be set by agreement between the umpire and one of the appraisers, which as noted above, must be "competent and impartial." (*Id.*) Thus, the Court agrees with Plaintiffs that here, the amount of loss cannot be valid or binding unless the appraiser that agreed to it—in this case Appraiser Sullenberger—was both "competent and impartial." (*Id.*)

As evidence of Appraiser Sullenberger's alleged impartiality and/or lack of competence, Plaintiffs primarily point to two things. First, Plaintiffs allege that Appraiser Sullenberger unfairly and unreasonably limited the scope of the appraisal. However, for the reasons already set forth above, the Court does not find that argument persuasive. Second, Plaintiffs allege that Appraiser Sullenberger was employed by Acorn Claims, the very same company that initially adjusted this case on behalf of Defendant and prepared two initial estimates. Although the Court agrees with Plaintiffs that this could be viewed as evidence of impartiality, the Court is troubled by the fact that Plaintiffs knew of this affiliation when they voluntarily agreed to continue with the appraisal process. (*See* Doc. No. 60 (Joint Status Update in which the parties indicate the appraisers for both sides have been selected, and the parties are moving forward with the appraisal process).) Moreover, this fact was also known at the time Judge Neureiter denied Plaintiffs' motion to halt the appraisal process midstream; and while he denied that motion *without* prejudice, it is worth noting that at least one judge has already found this lone fact

13

insufficient to set aside the appraisal process. (*See* Doc. No. 70.) Thus, the Court declines to set aside the appraisal award on this fact, alone.

However, Plaintiffs allege other indicators of bias/incompetence, including that two prior adjusters from Acorn Claims identified water intrusion as far back as September and October 2019—prior to the winter season—which tends to undercut Appraiser Sullenberger's conclusion that the water intrusion was caused by ice damming or improper drainage. (Doc. No. 74 at 11-12; Doc. No. 78 at 3-4.) Additionally, the appraisal award includes $10,000—the full policy limit for mold—but it is difficult to reconcile the notion that mold is causally related to the hailstorm, with the notion that water intrusion is not. Moreover, Appraisal Sullenberger suggests microbial growth is correlated to the alleged "ice damming" not the hailstorm, (Doc. No. 74-6 at 1), which also makes the mold payout somewhat curios. Further, the Court is not sure what to make of the allegation that Umpire Haber withdrew from the process at some point, only to be re-engaged by the parties later. (Doc. No 74 at 4 (stating that sometime during the appraisal process Umpire Haber "unexpectedly withdrew from her involvement in this matter[,]" and that "[i]n an effort to complete the Appraisal process, the parties signed a new Contract for Umpire Services with Ms. Haber.").) Likewise, the Court cannot determine, at this time, how it should factor in the allegations that Ms. Haber allegedly lost her insurance license and entered a no-contest plea to a criminal charge in Florida. (Doc. No. 74 at 13-14.)

At bottom, the Court does not have enough information to determine whether it must set aside the appraisal award due to bias or a lack of competence. Since Plaintiffs bear the burden of proof on this issue, the request to set aside the appraisal award must, at this time, be denied.

**II.     Request to Reopen Discovery**

Plaintiffs ask this Court to reopen discovery for the purpose of discovering information about the appraisal process. (Doc. No. 74 at 12-14.) The Court believes discovery will be helpful in determining whether the award should be set aside due to bias or lack of competence. The Court also agrees with Plaintiffs that if discovery reveals bad faith conduct on the part of Defendant during the appraisal process, such conduct might violate the insurer's "overarching duty of good faith and fair dealing," which "persists through the course of litigation." *Hometown Community Assoc. Inc. v. Philadelphia Indem. Ins. Co.*, No. 17-CV-00777-RBJ, 2017 WL 6335656, at *8 (D. Colo. Dec. 12, 2017).

### III.     Request for Sanctions

Pursuant to Rule 11(c), "[a] motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b)." Fed. R. Civ. P. 11(c). Plaintiffs failed to comply with that Rule and on this basis the Court denies the portion of Plaintiffs' Motion that requests sanctions. However, because Plaintiffs may file a motion for sanctions at later date, the Court will provide guidance to Plaintiffs as to what is and is not a proper basis for requesting sanctions.

First, and as to Plaintiffs' argument that Defendant acted in bad faith when it invoked the appraisal clause so late in litigation, the Court notes that Plaintiff initially opposed appraisal but ultimately *voluntarily* agreed to it. (Doc. Nos. 59, 60.) Moreover, when Plaintiff protested mid-process, Judge Neureiter ordered the parties to proceed. (Doc. No. 70.) Thus, any arguments regarding late-invocation were either waived by voluntary agreement to the appraisal process, or they were made in protest midway through the appraisal, and overruled by the court.

15

As to the argument that Defendant participated in the appraisal process in bad faith, the Court does not have enough information at this time to make such a determination.

\*\*\*

During the motion hearing on February 7, 2023, Defendant made an oral motion for reciprocal discovery concerning the appraisal process. However, unlike Plaintiffs in this case, Defendant has not pointed to any document or information that reflects some prior affiliation between Plaintiffs and their selected appraiser, or other evidence of bias or incompetence. Therefore, to the extent Defendant intended to move the Court for discovery on such topic, that motion is denied.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED THAT** "Plaintiffs' Motion to Set Aside Appraisal Award as to Total Amount of Loss and to Reopen Discovery. (["Motion"], Doc. No. 74.) is **GRANTED IN PART AND DENIED IN PART** as follows:

(1) Plaintiffs' request to set aside the appraisal award is **DENIED with prejudice** to the extent it is based on the argument that the award incorporates legal or coverage determinations; and

(2) Plaintiffs' request to set aside the appraisal award is **DENIED without prejudice** to the extent it is based on arguments of bias and/or incompetence. Plaintiffs are granted leave to file a motion to set aside the appraisal award *after* the parties have conducted limited discovery into the appraisal process; and

(3) Plaintiffs' request for sanctions is **DENIED without prejudice**; and

(4) Plaintiffs' request to reopen discovery is **GRANTED** as follows**:**

a. The parties shall negotiate a set of search terms to be applied to the electronic mailbox of any non-lawyer Defendant representative who communicated about the appraisal process.[3] To the extent the parties cannot come to agreement on the search terms or the list of custodians, the parties shall submit their dispute in the form of a Joint Discovery Dispute Report to the Court on or before March 10, 2023.

b. Defendant shall produce all relevant communications no later than fifteen (15) business days after the parties agree on, or the Court orders, a final search term and custodian list.

c. No later than fifteen (15) business days after receiving Defendant's production, Plaintiffs may serve a 30(b)(6) deposition notice on Defendant, outlining only topics that concern the appraisal process. Such deposition will be limited to four (4) hours.

d. Plaintiffs may also seek to depose Appraiser Sullenberger with respect to the appraisal process. Such deposition shall be limited to three (3) hours.

e. The limited discovery described herein must be completed on or before April 28, 2023.

Dated this 13th day of February, 2023.

**BY THE COURT:**

_____
Maritza Dominguez Braswell
United States Magistrate Judge

---

[3] The Court's reference to the "appraisal process" includes the invocation of the appraisal clause, the selection of appraisers and umpires, and the appraisal process itself, through and until the present date.